# APPENDIX - 8

Order Denying Various Motions to Dismiss,
With Some Treated Motions for
Summary Judgment

Commonwealth v. Demapan-Castro
Civil Action 04-0563

1    For Publication

2

3

4

5                              IN THE SUPERIOR COURT
                                      OF THE
6              COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

7    COMMONWEALTH OF THE            )   CIVIL ACTION NO.  04-0563
     NORTHERN MARIANA ISLANDS,      )
8    ex rel. PAMELA BROWN, ATTORNEY )
     GENERAL,                       )
9                                   )
                  Plaintiff,        )
10                                  )
          v.                        )
11                                  )
     ANA DEMAPAN-CASTRO, NICOLAS    )
12   NEKAI, FELIX SASAMOTO, MANNY   )   ORDER DENYING VARIOUS
     VILLAGOMEZ and BENITA          )   MOTIONS TO DISMISS, WITH SOME
13   MANGLONA, Members of the BOARD )   TREATED AS MOTIONS FOR
     OF DIRECTORS OF THE MARIANAS   )   SUMMARY JUDGMENT
14   PUBLIC LANDS AUTHORITY;        )
     MARIANAS PUBLIC LANDS          )
15   AUTHORITY; EDWARD DELEON       )
     GUERRERO; JESUS C. TUDELA,     )
16   Administrator of the ESTATE OF ANGEL )
     MALITE; and COMMONWEALTH       )
17   DEVELOPMENT AUTHORITY.         )
                                    )
18                Defendants.       )
                                    )
19   ───────────────────────────────

20          THIS MATTER was last before the Court on January 31, 2005 on various motions to dismiss

21   brought by the defendants.  Appearing at oral arguments and/or on the briefs were: Matthew T.

22   Gregory and Alan L. Lane for defendant Marianas Public Land Authority (MPLA), Mark S. Smith

23   for defendant the Board of Directors of MPLA, Ramon K. Quichocho for defendant Edward Deleon

24   Guerrero, the late Pedro M. Atalig and Antonio M. Atalig for defendant Jesus C. Tudela, as the

25   Administrator of the Estate of Angel Malite (Malite Estate), and Benjamin Sachs, Jeanne H.

26   Rayphand, and Deborah L. Covington for the plaintiff.  Having carefully considered the pleadings

27   and the arguments of counsel, the Court is now prepared to rule.

28          These motions are nominally motions to dismiss brought under Rule 12(b)(6), alleging that

1  plaintiff failed "to state a claim upon which relief can be granted." Com. R. Civ. P. 12(b)(6).  A

2  court analyzing such a motion must confine its "analysis to the allegations and implications

3  contained on the face of the complaint." *In re Estate of Roberto*, 2002 MP 23 ¶ 12.  However, where

4  "matters outside the pleading are presented to and not excluded by the court," the matter may be

5  treated as a motion for summary judgment under Rule 56. Com. R. Civ. P. 12(b).  In this case, both

6  sides have submitted a great deal of evidence on some of the issues involved.  Therefore, where

7  appropriate the Court will treat the motion to dismiss as a motion for summary judgment.[1]  The

8  Court will begin will a recitation of the relevant facts.  Unless otherwise noted, these facts are

9  undisputed.

10                          FACTUAL BACKGROUND

11  **I.    Facts Relating to the Land Claim at Issue**

12          This matter is ultimately about a piece of land, specifically 1.7 acres in the village of Susupe

13  that is now the site of Marianas High School.  The land was at one time owned by Angel Malite,

14  whose estate is a defendant in this action.  On October 9, 1978, the Trial Division of the High Court

15  of the Trust Territories issued a judgment in a condemnation action turning over the land in question

16  to the government, *In re Proceedings by the TTPI for Condemnation of the Property of the Estate*

17  *of Angel Malati, et al.,* Civ. No. 261 (T.T. Trial Ct. Oct. 9, 1978) (Judgment at 1-2), Title to the land

18  was issued to the Commonwealth shortly thereafter.  In exchange, the land owners, the estate of

19  Angel Malite and others, were awarded $3,682.30.  This money was to be deposited in a bank

20  account and held until: either all the condemnees had filed a signed stipulation for distribution of

21  the funds, or a court judgment had been entered distributing the funds.  *Id* at 2.  The money was

22  never distributed, in part because no stipulated distribution was ever prepared, and has now

23  apparently been lost.

24

25  _____

26          [1] When a Rule 12(b)(6) motion is converted to a Rule 56 motion for summary judgment, the parties must be given an opportunity to present "all material made pertinent" by the conversion. Com. R. Civ. Pro. 12(b).  In this case,

27  both sides have already submitted sufficient pertinent material for the Court to reach a determination.  Indeed, nearly all of the relevant facts are matters of public record and not disputed.  The dispute is over how the law is to be applied

28  to these facts.  The Court concludes that it would be a waste of time and resources to ask the parties for additional submissions of argument or evidence and so the Court will not do so.

1    The issue of this land then lay dormant from the 1978 judgment until June 30, 2004, when

2    Antonio M. Atalig, representing the Malite Estate, made a presentation to the MPLA Board, in

3    which he asked for payment of $3,450,000 for the land. This sum appears to have been calculated

4    by multiplying a claimed land value of $500 / square meter by the area of the property - 6,900 square

5    meters. This figure came from an appraisal report prepared by V.M. Sablan Appraisal Company,

6    which used August 30, 1991 as the time of taking. It is not clear why this date was selected, because

7    it has no obvious relationship to either the date the Declaration of Taking was issued - August 30,

8    1968, or the date of final judgment - October 9, 1978. After the June 30, 2004 meeting, MPLA's

9    appraisal reviewer, Mitch Aaron, attempted to contact the appraiser to ascertain why the 1991 date

10    had been used, but he never received a response.

11    On August 13, 2004, the MPLA Board again considered the Malite petition. The plaintiff

12    alleges that Antonio M. Atalig also appeared at this meeting on behalf of the Malite Estate. Mr.

13    Atalig then told the board that the Malite Estate owned the property in question - even though a

14    Certificate of Title in favor of the Commonwealth had been issued in 1978 - and stated that there

15    could be no legal objection to the petition, except as to price. MPLA legal counsel Alan Lane

16    suggested that MPLA staff be allowed to continue to investigate and secure a new appraisal.

17    However, board member and defendant Ana Demapan-Castro allegedly insisted that the vote be

18    taken immediately and the claim was approved.[2]

19    Subsequently, Edward Deleon Guerrero, also a defendant and ostensibly the Commissioner

20    of MPLA,[3] made a requisition, dated October 29, 2004, for the land compensation claim, payable

21    to defendant Jesus C. Tudela, the Administrator of the Malite Estate. The requisition was forwarded

22    to the Commonwealth Development Authority (CDA) for further processing.

23    On November 8, 2004, the office of the Attorney General asked CDA by letter to withhold

24    processing of the requisition. The letter stated that there were serious questions regarding the

25    _____

26    [2] The allegations are contained in plaintiff's complaint and have not yet been proven. However, the Court must assume they are true for the purposes of this motion.

27    [3] Part of the relief sought by plaintiff in this case is a declaration that Mr. Deleon Guerrero is not the

28    Commissioner.

- 3 -

1   propriety of the requisition - particularly because the Attorney General's Office believed that the

2   Malite Estate had no legal right to make a claim for compensation. The letter was signed by

3   Assistant Attorney General Benjamin Sachs and then Acting Attorney General Clyde Lemons, Jr.

4   CDA responded on November 15, 2004, by sending a letter to Mr. Deleon Guerrero stating that

5   CDA was returning the requisition to MPLA pending consideration of the legal issues raised by the

6   Attorney General's Office. The letter also stated that the Bond Trustee had been instructed not to

7   make any further disbursements based on that requisition.

8        On November 29, 2004, a meeting was held at the Office of the Governor to try to resolve

9   the issues in dispute. Over objection by the Office of the Attorney General, it was decided, with

10  MPLA and CDA concurring, that $3,450,000 would be disbursed to the Malite Estate. The Office

11  of the Attorney General then turned to this Court, which issued a temporary restraining order on

12  December 9, 2004.

13       The matter came on for hearing on a preliminary injunction on December 23, 2004. The

14  preliminary injunction would serve as an extension of the temporary restraining order, preventing

15  any disbursement of funds to the Malite Estate until the matter was decided by this Court. However,

16  this hearing became unnecessary, as plaintiff's counsel, Benjamin Sachs, told the Court that he had

17  received written assurances from CDA that it would not process any payment to the Malite Estate

18  until the legal questions about the claim had been resolved by the Courts. (CDA approval is

19  necessary for any disbursement of funds for land compensation.) Furthermore, the plaintiff stated

20  that CDA was no longer a necessary party and asked that the case against them by dismissed without

21  prejudice. The Court concurred and dismissed CDA without prejudice.

22  **II.     Facts Relating to the Pamela Brown's Alleged Confirmation as Attorney General**

23       On May 30, 2003, the position of Commonwealth Attorney General became vacant. On June

24  16, 2003, Governor Juan Babauta formally nominated Pamela Brown for the position. Ms. Brown

25  was then serving as the Governor's legal counsel and, according to the plaintiff, continued to serve

26  in that position until she was allegedly confirmed by the Senate on November 17, 2003.

27       Between Ms. Brown's nomination and her alleged confirmation, the Senate went through

28

-4-

1    an important change in membership. Specifically, then Senator Jose M. Dela Cruz pled guilty in

2    federal court to one count of conspiracy to commit fraud. At roughly the same time, and as a result

3    of the same scheme, then Senator Ricadro S. Atalig was arrested and charged with multiple fraud

4    counts. He was eventually convicted. As a result of these legal problems, the Senate was short two

5    members for much of the period between Ms. Brown's nomination and her alleged confirmation.

6    Mr. Dela Cruz had resigned his seat and Mr. Atalig, who refused to resign, was prevented by his

7    legal problems from attending sessions. Both of these Senators belonged to a "majority bloc" of

8    Senators.

9         The loss of these two senators from the majority in a 9-member senate meant that the four

10   members who previously were the minority, were now the majority, at least of those members able

11   to attend sessions. On August 27, 2003, this new majority attempted to take over the Senate.

12   Senators Paul A. Manglona, Diego Songao, and Joaquin G. Adriano left for lunch and did not return.

13   The remaining Senators: David M. Cing, Ramon S. Guerrero, Pete P. Reyes, and Thomas P.

14   Villagomez, continued to hold sessions. At one of these sessions, on September 17, 2003, this group

15   voted three to zero, with Senator Villagomez abstaining, to reject the nomination of Pamela Brown.

16   For reasons explained in detail below, the validity of this vote, and of all the sessions of this "rump"

17   Senate remain in dispute.

18        Eventually, the Senate was reconstituted. Mr. Dela Cruz was replaced by Joseph M.

19   Mendiola in an October 4, 2003, special election and Mr. Atalig was replaced by Paterno S. Hocog

20   in the November general election. Both of these new Senators joined with Senators Manglona,

21   Songao and Adriano to form a new majority. At their first meeting, on November 17, 2003, these

22   five Senators voted in favor of confirming Pamela Brown as Attorney General. Senators Cing,

23   Guerrero, Reyes, and Villagomez were not present. Ms. Brown formally assumed the office of

24   Attorney General shortly after the November vote and has served in that capacity ever since. At

25   present, there is a lawsuit, brought under the taxpayers' lawsuit provisions of N.M.I Const. art. X,

26   § 9, challenging Ms. Brown's right to the office. *Juan S. Demapan v. Pamela Brown, et. al.*, Civ.

27   No. 04-0573.

28

1                                       LEGAL CONSIDERATIONS

2        The movants have raised a number of grounds upon which they ask this Court to dismiss all

3  or parts of the case. This Court will consider these in turn.

4  **I.**    **Movants Have Failed to Prove that Pamela Brown is Not the Legitimate Attorney General.**

5

6        Movants seek to have this case dismissed by arguing that it was not brought by a legitimate

attorney general, because Pamela Brown is not lawfully entitled to the office. They make two claims

7  in support of this argument. First, they claim that Ms. Brown's appointment was affirmatively

8  rejected. Second, they claim that, if the rejection was not valid, her subsequent confirmation came

9  too late. The plaintiff disputes both these claims and has also challenged the constitutionality of the

10  law on which the second is based. The Court will begin by describing the statutes in question.

11          A.    The Statutes in Question

12        The position of Attorney General is grounded in, and defined by, our Commonwealth

13  Constitution. N.M.I. Const. art. III, § 11. The attorney general is charged with important duties,

14  including "providing legal advice to the governor and executive departments, representing the

15  Commonwealth in all legal matters, and prosecuting violations of Commonwealth law," and is to

16  be appointed by the governor "with the advice and consent of the Senate." *Id.* To insure an orderly

17  and timely confirmation process, and to prevent circumvention of the advice-and-consent function,

18  a specific time limit for confirmations was established by the first CNMI Legislature.

19        The applicable law is 1 CMC § 2904, which reads in pertinent part:

20

21             [i]f the appointment is not confirmed by the Senate . . . within 90 days from the date the person was temporarily appointed, the appointment shall automatically terminate,

22             the position shall become vacant and the person nominated shall not be renominated. Nothing in this section shall preclude the Governor from submitting an appointment

23             to a special session of the legislature.

24  This law prevents unconfirmed temporary appointees from continuing to hold office without the

25  constitutionally-mandated approval of the Senate. The plaintiff now argues that this law is

unconstitutional.

26          B.    1 CMC § 2904 is Constitutional.

27        As will be described in more detail below, the movants have argued that proper application

28

1    of 1 CMC § 2904 requires this Court to dismiss the complaint and to order the removal of Pamela

2    Brown as Attorney General. Specifically, movants have noted that Ms. Brown's purported

3    confirmation, on November 17, 2003, took place more than 90 days after her name was submitted

4    for confirmation, on June 16, 2003. They argue that this violates the provisions of Section 2904,

5    which cause "temporary appointments" to expire if not acted upon by the Senate within 90 days.

6         The plaintiff argues that this law is unconstitutional because it violates the separation of

7    powers doctrine. Plaintiff notes that the power to appoint officers of the executive branch is part of

8    the executive branch's appointment power. *Camacho v. Civil Serv. Comm'n*, 666 F.2d 1257, 1263.

9    (9th Cr. 1982) (striking down PL 1-9 § 3(a) as violating the executive branch's appointment power

10   because the legislation allowed the legislature to appoint six of the seven members of the Civil

11   Service Commission), (*citing Springer v. Philippine Islands*, 277 U.S. 189, 201-202, 48 S. Ct. 480,

12   482, 72 L. Ed. 845, 849 (1928)). Therefore, absent express constitutional authority, any statute

13   purporting to confer advice and consent authority on a legislative body is a usurpation of the

14   appointment power and contravenes the doctrine of the separation of powers. *See id.* The plaintiff

15   argues that the provisions of Section 2904 that limit to 90 days the amount of time that a temporary

16   appointee may serve without confirmation and bar renomination of that temporary appointee after

17   the 90 days has lapsed, unconstitutionally invade executive power.

18        The Court must disagree. While it is true that appointment of executive branch personnel

19   is normally an executive function, in this case the legislature has a constitutional right to advise and

20   consent on the selection of an attorney general. With this right comes the ability to make reasonable

21   rules governing the advice and consent process. The Court concludes that Section 2904 is a

22   reasonable rule. It protects the advice and consent function while not unduly encroaching on the

23   executive branch's appointment power. As such, the provisions of Section 2904 are not an

24   unconstitutional intrusion on the power of the executive branch. The Court must therefore turn to

25   application of this law to the current facts.

26   C.    Movants Have Not Proven that Pamela Brown's Confirmation Violated 1 CMC §
            2904.

27

28        The movants here argue that Pamela Brown's purported confirmation by the Senate is

- 7 -

1   invalid. According to them, if the Senate fails to confirm a governor's appointment within the 90-

2   day period provided by 1 CMC § 2904, then the appointment expires by operation of law. They

3   claim that anytime the Senate fails to confirm a nominee in a timely manner, this statute applies.

4   Unfortunately for movants, a close reading of the statute does not support their position.

5        By its express language, the 90-day limit in the statute applies only to persons who are

6   "temporarily appointed." 1 CMC § 2904. In this case, the Governor nominated Ms. Brown for the

7   position of attorney general, but did not temporarily appoint her. Ms. Brown did not assume the

8   office until after November 17, 2003, when five senators voted to confirm her. If this confirmation

9   is valid, then Ms. Brown never was "temporarily appointed" and the 90-day limit does not apply to

10   her.[4]

11        Movants have suggested that this reading of the statute would allow the executive branch to

12   circumvent the constitutionally mandated confirmation process. Therefore, they argue that the

13   statute should be read to include anyone nominated to a position requiring advice and consent,

14   whether that person serves in an acting capacity or not. As a matter of public policy, this is the

15   reading that the Court would prefer, because the Court believes that the better practice is to allow

16   a nominee to take over immediately, pending confirmation. In the Court's opinion, this leads to

17   smooth and more efficient operation of government. Certainly it is preferable to a series of caretaker

18   office holders.[5] Therefore, the Court would prefer that Section 2904 apply to all nominees, whether

19   they serve in an acting capacity while awaiting confirmation or not, and the Court hopes that the

20   legislature will enact such a law.

21        That said, this Court's duty is to say what the law is, not what it should be. In so doing, the

22

23

---

24      [4] If defendants could provide sufficient evidence that Ms. Brown were acting as a *de facto* attorney general while she was awaiting confirmation, it might be enough to start the 90-day clock. However, for reasons outlined below,

25   the Court has concluded that allowing defendants offer such evidence would be an unnecessary distraction in this case.

26      [5] Indeed, allowing a "caretaker" acting department head to serve in that position more than 30 days would likely violate another law, 1 CMC § 2902, which provides that, "[a]ppointments to positions which require the advice and consent of the Senate . . . shall be submitted to the appropriate presiding officer within 30 days following the date the

27   person was temporarily appointed." The Court believes that this provision applies to even a caretaker temporary appointee.

28

1    Court must give a statute its plain meaning and "it is assumed that the legislative purpose is

2    expressed by the ordinary meaning of the word used." *Commonwealth Ports Auth. v. Hakubotan*

3    *Saipan Enter., Inc.*, 2 N.M.I. 212, 222 (1991) (*quoting Office of the Attorney Gen. v. Cubol*, 3 CR

4    64, 73 (Dist. Ct. App. Div. 1987). In this case, the legislature passed a law that voided an

5    appointment "90 days from the date the person was temporarily appointed." 1 CMC § 2904.

6    Therefore, by the express language of the statute, the 90-day limit only applies to temporary

7    appointees and defendants have provided no evidence to this Court to show that Ms. Brown received

8    a temporary appointment. What the Court does have, is plaintiff's aversion that Ms. Brown did not

9    receive a temporary appointment. Because 1 CMC § 2904 does not apply to nominees who were

10   not temporarily appointed and because defendants have not shown that Ms. Brown was a temporary

11   appointee, either as a matter of fact or a matter of law, the Court must conclude that movants are not

12   entitled to summary judgment on this ground.

13        D.    Movants Argument that Ms. Brown's Appointment was Rejected is Not Well
              Founded.

14

15            In addition to claiming to that Ms. Brown's purported confirmation was untimely, movants

16   have also argued that it was preceded by an affirmative rejection. This argument is based on a vote

17   taken on September 17, 2003, in which the four members present voted 3-0 with one abstention to

18   reject Ms. Brown's nomination. If this vote were valid, the later "confirmation" that occurred would

19   have no legal effect. The September 17 vote would have disposed of Ms. Brown's nomination and

20   1 CMC § 2904 would prevent her from being renominated. Unfortunately for the movants, the four

21   senators present at the time were not sufficient to constitute a quorum and without a quorum no

22   official action may be taken.

23            The Senate rules that existed at the time of the September 17, 2003, "session" provided that

24   a majority of the Senators must be present to form a quorum. Official Rules of the Senate 3, § 1.

25   The Senate Journal for that day shows only four members were present - Senators David M. Cing,

26   Ramon S. Guerrero, Pete P. Reyes, and Thomas P. Villagomez - out of seven total. The other three

27   listed were Senators Paul A. Manglona, Diego Songao, and Joaquin G. Adriano. If the journal is

28   correct that the CNMI had only seven Senators at the time, then the four Senators present that day

- 9 -

1  would be a majority. However, the journal omitted Senator Ricardo S. Atalig. He was, at the time,

2  no longer able to attend sessions, but had not formally relinquished his seat. His status was the

3  subject of a then-ongoing legal challenge.

4      In that case, *Commonwealth v. Atalig,* Civ. No. 03-0396 (N.M.I. Super. Ct. Oct. 2, 2003)

5  (Order Denying Writ of Quo Warranto and Dismissing Counterclaim), the acting attorney general,

6  Clyde Lemons, Jr., sought to oust Mr. Atalig from his seat. The *Atalig* court considered various

7  arguments and concluded that the only means by which a Commonwealth Senator may be removed

8  are by vote of three-fourths of the members of the Senate, as provided in N.M.I Const. art. II, §

9  14(a), or by recall petition, as provided in N.M.I. Const. art. IX, § 3. *Id* at 8. The Court found that

10  neither of these had occurred. *Id.* Because he was never removed and did not resign until after the

11  November election, Mr. Atalig was still a Senator at the time the September 17, 2003, "session" was

12  held. That means there were eight Senators in the Commonwealth at the time and five senators

13  were needed to form a quorum. Only four were present, so there was no quorum and the vote to

14  reject Ms. Brown's nomination was invalid. Movants may not look here to disqualify Ms. Brown.

15      E.    Assuming No Time-Bar Under 1 CMC § 2904 and No Procedural Defect, Ms.
            Brown's Confirmation was Proper.

16

17      This leaves the Court with Ms. Brown's purported confirmation. This occurred on

18  November 17, 2003. Five Senators, of the nine total, were present, constituting a quorum. These

19  five then voted unanimously to approve Senate Committee Report 13-93, approving the nomination

20  of Ms. Brown to the post of Attorney General. This session was widely reported in the media and

21  the plaintiff has introduced ample evidence to substantiate that a session was held and a vote was

22  taken. Movants can only respond by arguing that the vote was not properly recorded in the Senate

23  Journal. Where the evidence is so clear and overwhelming, this is a technicality at best. In any case,

24  the non-movants have shown that, at the very least, there is a material dispute as to whether the

25  confirmation occurred on that day and that is enough to preclude summary judgment in the movants'

favor on the question.

26

27      This confirmation notwithstanding, however, the Court is not entirely satisfied that Ms.

28  Brown's entitlement to the office of attorney general has been proven. There is still a potential

- 10 -

1  question of fact about the November 17, 2003, "confirmation," as it may not have been properly

2  recorded. More importantly, as is mentioned above, the Court has concluded that the 90-day limit

3  found in 1 CMC § 2904 would apply even in a case where a nominee is not temporarily appointed,

4  if it could be proved that the nominee was acting as a *de facto* temporary appointee. The Court

5  suspects that a strong case could be made here that Ms. Brown did supervise activities at the

6  Attorney General's office before her confirmation. Therefore, the Court must consider whether this

7  case is the proper venue to hear that evidence.

8          F.      The Court Will Not Consider Evidence on the Question of Ms. Brown's Acting as
                   a *De Facto* Attorney General Prior to Her Confirmation.

9

10        This Court was severely conflicted in considering whether to hear evidence concerning Ms.

11 Brown's actions relative to the Attorney General's Office after her nomination but prior to her

12 confirmation. The Court believes that a full hearing of these questions would be valuable to and

13 instructive for the people of the Commonwealth. However, the Court is also mindful that Ms.

14 Brown's legitimacy is being directly challenged in another court. Specifically, in *Demapan v.*

15 *Brown, et. al.,* Civ. No. 04-0573, currently before Presiding Judge Robert C. Naraja. This Court

16 trusts that Presiding Judge Naraja can and will handle the matter expeditiously and fairly.

17 Therefore, this Court would only hear such evidence if it proved directly relevant.

18        In this case, the Court must preliminarily conclude that Ms. Brown's legitimacy is not

19 directly relevant. The Court has been aware of the potential problems that might arise from the

20 questions surrounding Ms. Brown's legitimacy for some time, from well before the instant case was

21 filed in fact, and the Court has been considering what to do should the question arise. Indeed, this

22 Court is not the first in the Commonwealth to consider such a question. In *Commonwealth v. Yi*

23 *Xiou Zhen,* 2002 MP 4, the Supreme Court considered whether to vacate the conviction of Ms. Zhen

24 on the grounds that it had been commenced by an acting attorney general who had not been

25 confirmed by the Senate. *Id* at ¶ 36. Ultimately, the Court did not need to reach that issue, as the

26 appellant had waived her right to challenge the Acting Attorney General's appointment because she

27 failed to raise an objection prior to trial. *Id* at ¶ 38. However, the Court cited with approval a

28 number of federal cases in which courts held that the lack of a properly appointed U.S. Attorney

- 11 -

1    does not deprive the government of the ability to prosecute.[6] *Id* at ¶ 40.

2        Other courts in the Commonwealth have agreed. When considering a similar question -

3    whether an Information filed by an "acting" Attorney General was valid, then Presiding Judge

4    Edward Manibusan concluded that a vacancy in the Attorney General's office does not prevent the

5    executive from prosecuting cases. *Commonwealth v. Rabauliman,* Crim. No. 98-0083 (N.M.I.

6    Super. Ct. May 15, 2000) ([Unpublished] Order at 5). Similarly, now Presiding Judge Robert C.

7    Naraja, in a case where the validity of the prosecution was attacked based on the very questions

8    about Ms. Brown's legitimacy that are raised in the instant case, concluded that a vacancy at the

9    position of Attorney General does not deprive the Office of the Attorney General of the power to

10   bring prosecutions.[7] *Commonwealth v. Peredo,* Crim. No. 04-0181 (N.M.I. Super. Ct. Jan. 31, 2005)

11   ([Unpublished] Order Denying Defendant's Motion to Dismiss Information as Not Brought by

12   Lawful Attorney General at 6).

13       These cases are in line with this Court's continued thinking on the matter. The mere fact that

14   there is a no valid occupant of the post "Attorney General" does not deprive the office of the power

15   to bring prosecutions, be they criminal or civil. Given this, even if it is ultimately decided that Ms.

16   Brown is not the lawful attorney general, it cannot and should not affect the further progress of this

17

18   _____

19   [6] The citation list reads:, *"United States v. Whitehead,* 200 F.3d 634, 641(9th Cir. 1999), *cert. denied,* 531 U.S.
     885, 121 S. Ct. 202, 148 L. Ed. 2d 141 (2000) (rejecting the argument that the district court lacked jurisdiction over the
20   appellant's case because the interim appointment of the U.S. Attorney . . . violated the Appointments Clause of the
     Constitution . . .); *United States v. Gantt,* 194 F.3d 987, 998 (9th Cir. 1999) (holding that [ ] an unconstitutional
21   appointment of a United States Attorney . . . ."would not generally affect the jurisdiction of this court so long as a proper
     representative of the government participated in the action."); *United States v. Fitzhugh,* 78 F.3d 1326, 1329-30 (8th Cir.
22   1996) (holding that an indictment obtained by an Independent Counsel who may have exceeded his authority did not
     affect the government's power to prosecute and thus did not deprive the district court of jurisdiction); *United States v.*
23   *Easton,* 937 F.2d 160, 162 (5th Cir. 1991) (holding that the district court's jurisdiction was not impacted by the fact that
     the assistant United State's Attorney who signed the indictment had been directed to do so by a United States Attorney
24   who was disqualified to participate in the prosecution of the case)." *Commonwealth v. Yi Xiou Zhen,* 2002 MP 4 ¶ 40.

     [7] In so finding, Presiding Judge Naraja cited both *Commonwealth v. Yi Xiou Zhen,* 2002 MP 4 (at 5) and
25   *Commonwealth v. Rabauliman,* Crim. No. 98-0083 (N.M.I. Super. Ct. May 15, 2000) ([Unpublished] Order) (at 5-6).
     He also cited three cases from outside the jurisdiction that are not mentioned in *Zhen: United States v. Hilario,* 218 F.3d
26   19 (1st Cir. 2000) (holding that prosecutions brought by a U.S. Attorney who had improperly held the post for more than
     six years were nonetheless valid); *United States v. Durham,* 941 F.2d 886 (9th Cir. 1991) (holding that the special
27   prosecutor's potentially defective appointment was not sufficient to reverse a conviction); and *United States v. Emery,*
     1 C.M.R. 643, (A.F.C.M.R. 1951) (holding that failure to administer a proper oath to the prosecutors did not invalidate
28   the case.).

1  case, because Ms. Brown's legitimacy is immaterial.[8]  Therefore, the Court is content to allow

2  Presiding Judge Naraja to decide this dispute in *Demapan v. Brown*, where it is directly at issue,

3  while this Court will concentrate on the merits of this matter.  Movants motion to dismiss the

4  complaint on the grounds that it is not brought by a lawful attorney general, treated as a motion for

5  summary judgment, must be and is **DENIED**.

6  **II.     There is No Legislative Bar to Prosecution of this Action.**

7          Movants have argued that the instant action is barred by the relevant legislation, Public Law

8  13-25, codified at 2 CMC §§ 4741, *et seq.*  Section 4748 of Title 2 of the Commonwealth Code

9  provides for Administrative Review of Administrative Hearings decisions. It provides: "any person

10  or party affected by . . . decisions of the agency made pursuant to Section 4747 of this Act may

11  appeal to the Board of Public Lands." 2 CMC § 4748(a).  Failure to do so within 15 days renders

12  the "findings, orders or decisions" that came out the hearing pursuant to 2 CMC § 4747,

13  "unreviewable administratively or judicially." 2 CMC § 4748(a).  On its face, this seems to be a bar

14  to the instant action.  However, because the basic requirements triggering 2 CMC § 4748(a)  were

15  not met, the bar to judicial review does not apply in this instance.

16          Section 4747 sets forth specific procedures for holding an administrative hearing on a land

17  claim. 2 CMC § 4747.  Under Section 4747, the hearing process is initiated when "upon a written

18  offer of just compensation, a land owner disputes the method used to determine, or the amount of,

19  the just compensation offered . . . ." 2 CMC § 4747(a).  A hearing must then be held in accordance

20  with the detailed requirements set forth in the appropriate portions of the Administrative Procedures

21  Act, 1 CMC §§ 9109-9110. 2 CMC § 4747(b).  Only after a properly held hearing has occurred and

22  findings have been issued, are the administrative review provisions of Section 4748 triggered.  In

23  this case, the proper procedure was not followed.

24

---

25          [8] Of course, her questionable status could still be raised as an evidentiary issue.  For example, if it could be
shown that her questionable status makes particular witnesses or evidence less trustworthy, then this would certainly be

26  relevant and the Court would consider it in due course.  However, the issues in this case appear to the Court to be
primarily legal, not factual, and the mere allegation that the case might not have been brought if some other person

27  occupied the Attorney General's desk is insufficient. (That a different prosecutor might not have brought a case is true
in every criminal or civil prosecution and by itself is meaningless.)  The Court will be watchful to prevent irrelevant

28  speculation and personal attacks from distracting from the merits of the case.

1    The problems with the process in this case begin with Section 4747(a), which requires a

2    hearing only after the "land owner" requests one. In this case, the Complaint alleges that the

3    Commonwealth, not the Malite Estate, is the owner of the land in question. Indeed, as mentioned

4    in the Factual Background section above, the Commonwealth was awarded ownership of the land

5    by the Trust Territory High Court in 1978. *In the Matter of the Proceedings by the TTPI for*

6    *Condemnation of the Property of the Estate of Angel Malati, et al.,* Civ. Act. 261 (T.T. Trial Ct. Oct.

7    9, 1978). Because the apparent owner of the land in question, the Commonwealth, never asked for

8    hearing, no Section 4747 hearing was required. Without a proper Section 4747 hearing, the bar on

9    judicial review found in Section 4748 is inapplicable. 2 CMC §§ 4747-48 (the right to

10   Administrative Review occurs only after an adverse ruling in a Section 4747 hearing).

11   In addition, even if the Court were to accept for the sake of argument that the Malite Estate

12   still owned the land in question, its executor never asked for a hearing. Instead, the attorney for the

13   estate presented MPLA with an appraisal and asked them to approve it and eventually they did.

14   Neither the procedures for holding the hearing that are described in 1 CMC § 9109 and required

15   under 2 CMC § 4747(b), nor the procedures for issuing a decision that are described in 1 CMC §

16   9110 and required by 2 CMC § 4747(b) were complied with.[9] Having utterly failed to follow the

17   proper procedures required under 2 CMC § 4747, MPLA may not now claim the protections of 2

18   CMC § 4748. ( In addition to the procedural problems mentioned here, the Court notes that the

19   matter of the Malite Estate is still pending before the Court. *In re Estate of Angel Malite,* Civ. No.

20   97-0369. If the estate is owed money for unpaid land claims, this should probably be raised as part

21   of that case before filing a claim with MPLA). Defendants motion to dismiss on the grounds that

22   the plaintiff's claim is barred by 2 CMC § 4748 must be and is **DENIED.**

23   **III.    The Delegation of Power to MPLA to Adjudicate Land Claims Does Not Prevent the
         Office of the Attorney General from Bringing this Action.**

24

25   The Malite Estate, in its brief in support of its motion to dismiss, have suggested that this

26

27       [9] The factual assertion that MPLA did not comply with proper hearing procedures is based on information
         contained in the plaintiff's complaint and pleadings. The Court must accept these as true at this point in the proceedings.

28   Of course, if the defendants have contrary evidence to present, the Court will consider it at the appropriate time.

1    case should be dismissed because the office of the Attorney General lacks the power to decide land

2    compensation issues based on the exercise of eminent domain. The estate cites the various laws that

3    created MPLA and charged it with compensating those whose land is taken by the government. This

4    argument is wholly without merit. The plaintiff in this case does not seek to decide a land

5    compensation issue, rather it seeks to prevent MPLA from offering compensation to the Malite

6    Estate through a procedure and in an amount that allegedly violates the law. This is well within the

7    Attorney General's power. The Malite Estate's motion to dismiss on this basis must be and is

8    **DENIED**.

9    **IV.    The Attorney General May Proceed with this Case Without the Governor's Approval.**

10    Movants argue that the instant action should be dismissed because the Governor did not

11    approve the suit. The Court sees two problems with this argument. First, the movants have not yet

12    offered any evidence that the Governor prohibited this suit. Their mere assertion that this is true is

13    insufficient to overcome the presumption in favor of non-movants. Second and more importantly,

14    the Governor's consent is irrelevant, because the Attorney General has the power, both at common

15    law and under N.M.I. Const. art III, § 11, to bring suit as a relator on behalf of the Commonwealth.

16    In other words, her power to act is not solely derivative of the Governor's executive authority.

17             A.    The Attorney General Has Sufficient Power Pursuant to the Common Law to Bring

18                   this Suit, Even Without the Permission of the Governor.

19    In the Commonwealth, "the rules of the common law, as expressed in the restatements . . .

20    and, to the extent not so expressed as generally understood and applied in the United States, shall

21    be the rules of decision in the courts of the Commonwealth, in the absence of written law or local

22    customary law." 7 CMC § 3401. *See also, Ada v. K. Sadhwani's Inc.,* 3 N.M.I. 303, 308 (1992).

23    In the United States, the common law has provided authority for attorneys general to bring actions

24    on behalf of the sovereign. It is this source of power that provides the Attorney General the

25    authority to represent, defend and enforce the legal interests of state government and the public. In

26    most states and territories, including this one, the office retains common law authority, as well as

27    the powers and duties specifically assigned by constitutions and statutes.

28    One court has described the common law powers of the attorney general as follows:

- 15 -

1

2

3

> The attorney general may institute, conduct, and maintain all [ ] actions and proceedings as he deems necessary for the enforcement of the laws of this state, the preservation of order, and the protection of legal right. The attorney general's discretion to bring suit is plenary and is beyond the control of any other state department or officer.

4   *Minnesota ex rel. Hatch v. Am. Family Mut. Ins.*, 609 N.W.2d 1, 3 (Minn. Ct. App. 2000) (internal

5   citations omitted); *accord, Florida ex rel Shevin v. Exxon Corp.*, 526 F.2d 266, 268-69 (5th Cir.

6   1976) (noting that an attorney general, absent specific legislative or constitutional provision,

7   normally has powers beyond those explicitly provided by constitution or statute). In the

8   Commonwealth, there is no specific constitutional provision or legislative enactment limiting the

9   scope of the attorney general's power.[10] Furthermore, the instant suit, directed as it is at preventing

10  an act by MPLA that the plaintiff alleges is an illegal expenditure of public funds, is well within the

11  ordinary power of an attorney general to bring, with or without the permission of some other

12  Commonwealth "department or officer." *Am. Family Mut. Ins.*, 609 N.W.2d at 3.

13      B.    The Attorney General Has Sufficient Power Under the Constitution to Bring this
              Suit, Even Without Permission of the Governor.

14

15          The office of the Attorney General is one of the few executive branch offices mentioned by

16  name in our Commonwealth Constitution.[11] N.M.I. Const. art. III, § 11. The Constitution

17  specifically makes the attorney general responsible for "prosecuting violations of Commonwealth

18  law." *Id.* This term includes not only criminal, but also civil violations of the law. Thus, the

19  Constitution grants the attorney general independent power to initiate criminal and civil lawsuits to

20  uphold Commonwealth law, as the plaintiff alleges is being done in this case. This power is

21  independent of even the governor's power to run the executive branch.

22          To find that the attorney general was nothing more than the governor's servant and

23  mouthpiece would severely limit the ability of the attorney general's office to carry out its traditional

24

25      [10] The N.M.I. Const. art. III, § 11 and 1 CMC § 2153 both describe certain powers and duties of the Attorney
        General. However, neither limits the Attorney General's powers to those specifically delineated in the constitution or

26      by statute.

27      [11] The others being the governor, lieutenant governor, public auditor, executive assistant for Carolinian affairs,
        special assistant for women's affairs, and the resident executive for indigenous affairs. N.M.I. Const. art. III, §§ 2, 3,

28      12, 18, 22, and 23

1  watchdog role.[12] For example, it is easy to imagine a situation where a particularly unscrupulous

2  governor might order an attorney general to institute prosecutions against his or her political enemies

3  or refrain from prosecuting his or her friends. Similarly, the attorney general might be ordered to

4  cease investigations or prosecutions involving the governor personally.[13] This is simply untenable,

5  and inconsistent with the attorney general's constitutionally-delegated responsibility for prosecuting

6  violations of Commonwealth law. *See* N.M.I. Const. art. III, § 11. A close reading of the

7  Constitution reveals that the attorney general does not need the permission of the governor, or any

8  other cabinet officer, to prosecute violations of the law, and need not cease such prosecutions if the

9  governor disapproves.[14]

10      C.    The Case Law Cited by Movants is Distinguishable.

11      The movants submitted a number of cases in support of their argument that the Attorney

12  General cannot proceed in the face of the Governor's opposition. However, none of these cases is

13  squarely on point. One series of cases cited, including *Baxley v. Rutland*, 409 F. Supp. 1249, 1257

14  (D. Ala. 1976), hold that an attorney general may not mount "an attack by the State upon the validity

15  of an enactment of its own legislature." In the instant matter, the Attorney General's Office alleges

16  that it is attempting to uphold a law - it is certainly not attacking the validity of a law.[15] In another,

17  *California ex rel. Deukmejian v. Brown*, 624 P.2d 1206 (Cal. 1981), the court held that the attorney

18  general could not challenge the constitutionality of a law when the governor had decided not to

19  challenge it. This case is not applicable here, because the State of California specifically subjects

20

21      [12] The role is so important that the Court, before being appointed to the bench, frequently argued for the Attorney General to be elected instead of appointed, and proposed an amendment to that effect at the second

22  Constitutional Convention. The Court still believes that an elected attorney general is better able to protect the interests of the people than an appointed one.

23      [13] In making these arguments, the Court is no way means to imply that any such allegations could be made against the current Governor.

24

25      [14] Of course, this does not mean that the Attorney General may simply run wild, with no supervision or input from the Governor. The Governor still appoints the Attorney General, subject to the advice and consent of the Senate, and the Governor may still terminate the Attorney General at will.

26

27      [15] This case law could potentially be relevant to the plaintiff's challenge to the constitutionality of 1 CMC § 2904. However, because the Court has already found that the statute is constitutional, the issue is moot. The Court offers no opinion as to whether the plaintiff's challenge to the constitutionality of Section 2904 was or was not a proper

28  stance for an attorney general to take.

1     its attorney general to the power of the governor. *Id* at 1209 (*citing* CAL. CONST. art. V, § 13:

2     "[s]ubject to the powers and duties of the Governor, the Attorney General shall be the chief law

3     officer of the State."). We have no such limitation under our law or constitution.

4         The last case cited is more troubling. In *Arizona State Land Dep't v. McFate*, 348 P.2d 912

5     (Ariz. 1960), the Arizona Supreme Court held that the attorney general could not sue the Arizona

6     State Land Department to prevent it from making a land sale that the attorney general believed was

7     illegal. *Id.* at 918. The court based its reasoning on two basic pillars. First, the *McFate* court noted

8     that the power to supervise the executive branch belonged exclusively to the governor and the

9     department in question was part of the executive branch. *Id.* Therefore, the court concluded, the

10     attorney general was improperly exercising supervisory powers vested solely in the governor. *Id.*

11     Second, the court concluded that suing an executive department was inconsistent with the attorney

12     general's role as legal advisor to the executive branch. *Id.*

13         This case would seem to be applicable to the case at bar. As in Arizona, our Governor is

14     "responsible for the faithful execution of the laws," N.M.I. Const. art. III, § 1 and so, is in charge

15     of the executive branch. Also, as in Arizona, the Attorney General is charged with "providing legal

16     advice to the . . . executive departments." N.M.I. Const. art. III, § 11. However, there are important

17     facts that make the instant matter distinguishable from the *McFate* case. First, the Arizona

18     Constitution, art. V, § 9, provides that: "[t]he powers and duties of . . . [the] Attorney General, . . .

19     shall be as prescribed by law." *McFate,* 348 P.2d at 914. The Arizona Supreme Court has

20     specifically held that this clause refers solely to statutory law, not common law. *Id.* By contrast,

21     our Commonwealth Constitution contains no such clause and the common law is explicitly

22     recognized, absent contrary written or customary law. *See* N.M.I. Const. art. III, § 11 and 7 CMC

23     § 3401.

24         Second, the agency involved in *McFate* appears to have been an ordinary part of the

25     executive branch. The department was headed by a commissioner who was appointed by the

26     governor with the advice and consent of the state Senate. ARIZ. REV. STAT. §§ 37-102, 37-131, and

27     38-211. The commissioner serves at the will and pleasure of the governor. ARIZ. REV. STAT. § 37-

28

1   131. By contrast, the agency involved here, MPLA, is an independent agency within the executive

2   branch. 1 CMC §§ 2801, *et seq.* The members of its Board of Directors are appointed by the

3   governor with the advice and consent of the Senate, but they serve for a term of years - not at the

4   will and pleasure of the governor. N.M.I. Const. art. XI, § 4(a), 1 CMC § 2801. As such, they are

5   not directly under the Governor's supervision. Therefore, the Attorney General is not interfering

6   with any prerogative of the Governor in maintaining the present lawsuit.

7       Third, the Board of Directors is empowered to obtain its own legal counsel, 1 CMC §

8   2802(c), and it is clear in this case that the Board has hired a number of highly capable private

9   attorneys to be its advisors and advocates. This prevents the sort of conflict of interest problems that

10  worried the Arizona Court.[16] In sum, the Arizona case represents a minority view about the scope

11  of an attorney general's powers and duties that is not shared by the Commonwealth, raises issues

12  that are not present in the instant case, and is in all relevant ways distinguishable from the case at

13  bar. The movants motion to dismiss this matter on the grounds that the lawsuit was not approved

14  by the Governor is without merit, both because movants have not proven that the Governor

15  disapproved and because the Governor's approval or disapproval is irrelevant. This motion must

16  be and is **DENIED**.

17  **V.   Dismissing Edward Deleon Guerrero from this Action is Unwarranted.**

18      Defendant Edward Deleon Guerrero has moved this Court to dismiss him from the action.

19  In support of this argument, Mr. Deleon Guerrero raises several of the arguments that this Court has

20  already found unpersuasive. In addition, he argues that he should be dismissed because, under 1

21  CMC § 2802(c), only the Board of Directors has the capacity to be sued. The Court finds this

22  argument unconvincing. The statute cited is clearly permissive, saying only that the Board "may

23  . . . sue and be sued in its own name." *Id.* This is no bar to suing individual members of the Board

24  or their agents. In any case, it is not clear that Mr. Deleon Guerrero is being sued in his official

25  capacity as the alleged Commissioner of MPLA, because the case caption does not mention his title.

26

27      [16] In reaching its decision, the Arizona Supreme Court took note that Arizona law specifically prohibited the
Arizona State Land Department from employing its own legal counsel. *Arizona State Land Dep't v. McFate*, 348 P. 2d
28  912, 916 (Ariz. 1960). In this case, of course, MPLA is allowed to hire its own counsel and has done so.

- 19 -

1    Mr. Deleon Guerrero has advanced no legal reason why his dismissal is required by statute.

2         In addition, Mr. Deleon Guerrero has argued that his dismissal is permitted because he is not

3    a necessary party. The Court also finds this argument unconvincing. Mr. Deleon Guerrero's status

4    as alleged Commissioner of MPLA is a subject of the lawsuit - plaintiff seeks a declaration that Mr.

5    Deleon Guerrero holds the office illegally. Mr. Deleon Guerrero is certainly a necessary party to

6    this part of the action. Therefore, Mr. Deleon Guerrero motion to be dismissed from this action must

7    be and is **DENIED**.

8    **VI.    Joinder of the Department of Finance is Unnecessary.**

9         Finally, Defendant Edward Deleon Guerrero has argued that the complaint is defective and

10   should be dismissed under Commonwealth Rule of Civil Procedure 19 for failure to join a necessary

11   party - the Department of Finance. Under the rule, joinder of a particular party is preferable if:

12              (1) in the [party's] absence complete relief cannot be accorded among those already
               parties, or (2) the [party] claims an interest relating to the subject of the action and
13              is so situated that the disposition of the action in the [party's] absence may (i) as a
               practical matter impair or impede the [party's] ability to protect that interest or (ii)
14              leave any of the persons already parties subject to a substantial risk of incurring
               double, multiple or otherwise inconsistent obligations.
15
     Com. R. Civ. P. 19. Mr. Deleon Guerrero argues that, because the Department of Finance is given
16
     specific constitutional authority to "control and regulate the expenditure of public funds," N.M.I.
17
     Const. art. X, § 8, no lawsuit alleging an improper expenditure of funds public funds may proceed
18
     without it. However, this is no bar to complete relief for the plaintiff, the only party seeking relief
19
     in this case. The primary decision-maker in this instance is not the Department of Finance. It is
20
     MPLA. Furthermore, it is the allegedly illegal acts of MPLA that plaintiff is seeking to enjoin. It
21
     is clear that the plaintiff could obtain complete relief without the involvement of the Department of
22
     Finance.
23
          Similarly, the Department of Finance is in no danger of having its interests impaired or of
24
     being subjected to inconsistent obligations. It is the Commissioner of MPLA, (subject to approval
25
     of the claims by the Board) and not Department of Finance, who may authorize payments from the
26
     Land Compensation Fund. 2 CMC § 4743(e). The consent of the Secretary of Finance is necessary,
27
     but the Secretary is not the decision-maker. Instead, it appears that the Secretary's role is primarily
28

                                                    - 20 -

1    ministerial. Indeed, the Court does not believe that the Secretary could refuse to expend funds from
2    the Land Compensation Fund if he or she has been presented with a legal and proper authorization
3    by the primary decision makers.[17] Therefore, the Secretary has no real interest to protect here.

4          Furthermore, it has been represented to the Court that the Secretary of Finance has already
5    withdrawn his initial approval of the payout to the Malite Estate and has stated that he will not
6    process any such payout until the issues in this case have been resolved. Therefore it is unlikely that
7    the Secretary will be subject to inconsistent obligations. Either the actions of MPLA will be
8    approved by the Court, and the payment can proceed, or they will not and there will no payment to
9    process. In sum, the Department of Finance is not an indispensable party to this action and the
10   failure to join the Department or the Secretary is no bar to proceeding. Defendant Edward Deleon
11   Guerrero's motion to dismiss this action on the grounds that an indispensable party has not been
12   joined must be and is **DENIED**.

13                                    CONCLUSION

14         The Court has carefully examined the various grounds brought by the various defendants
15   seeking to have this matter dismissed and has found them all lacking. The Court now hopes that the
16   parties will turn their attention to the vital legal questions presented in the complaint.

17         For the reasons stated above, all motions to dismiss brought by defendants, both individually
18   and severally, and whether or not treated as motions for summary judgment, are **DENIED**.

19         SO ORDERED this 22nd day of March 2005

20
21
22                                         /s/
                                           JUAN T. LIZAMA, Associate Judge
23
24
25
26
27   _____
28         [17] However, the Secretary probably could refuse to approve an obviously improper request.

                                         - 21 -